# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Dr. William Avery | ) | |
| Plaintiff, | ) | May 7, 2006 |
| Vs. | ) | |
| | ) | Civil Action No: 05-01108  GK |
| United States of America, | ) | The Honorable Judge Kessler |
| Defendant. | ) | |

## SUPPLEMENTAL INFORMATION TO EXPLAIN LAWSUIT, EXPLAIN ACTIONS, CORRECT HISTORY AS STATED BY DEFENDANTS  AND DESCRIBE  WHAT OCCURRED HERE AS HIGHLY UNUSUAL

This document shall not serve as an Answer to the motion for dismissal, to be

filed by defendants on or before May 22, 2006 by the United States and is in advance of

said filing. **This document will explain what this lawsuit is about and why it was**

**filed**. It does seem that per the document dated April 17, 2006, entitled "Parties Report

To the Court And Discovery Plan", filed by defendants,  that  the Assistant U.S.

Attorney's office has no clue as to what they did to William Avery, what they destroyed,

what defendants are currently doing to Avery, and what this lawsuit is actually

RECEIVED

MAY - 8 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

RECEIVED

MAY 8 - 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

uncovering.   It is not merely about a credit report or outrageous conduct to collect large sums of money that William Avery did not owe in the form of student loans.

Evidence will show that Defendants did not know what was happening here and that they have never known the correct balance as to William Avery's student loans that Avery received while attending dental school at the University of Pittsburgh from 1982 - 1987.  Despite Dr. Avery's attempt to tell defendants and provide documentation as to explanation and correction, the government ignored him, which led to this lawsuit.  This information was blocked in history by previous voluntary dismissal by Pennsylvania attorneys in 1994 (attachment 4).  Disclosure was  blocked  again by summary judgment of the United States in 1998. Disclosure was blocked again and for a third time when defendants lost the exhibits and ignored documents enclosed in Avery's tort claim filed in 2000 (attachment 7).

## **Dr. Avery paid off his undergraduate and college loans – because they were the correct amount and he did owe that correct amount.**

However what you are about to learn and as performed/ occurred at the University of Pittsburgh Dental School and now performed by the United States – has been a deliberate travesty of intentional and shoddy record keeping and as evidence will show,   was brought on by deception and malice at the University of Pittsburgh Dental School in 1982 – 1987, while Avery was there, and then by the United States in 1998 by summary judgment (attachment 1). We will be returning to attachment 1, several times.

In 1998, Avery was not against the United States but will now reveal in this document as to what the United States Attorney(s) kept blocking by immediately filing for summary judgment(s) – and before disclosure. You will never know the correct balance by doing this – as there has been a deliberate deception – that would block the defendants from ever knowing Avery's correct balance then and now in 2006.

Embarrassingly enough, evidence will show that the United States has been shooting itself in the foot by rushing for summary judgments which would block the disclosure of Avery's correct balance and thus created this lawsuit. In short, the United States could never learn the truth – because the United States was blocking itself from learning the truth - and the correct balance by rushing to file summary judgments and in advance of disclosure.

By the end of this document – defendant will see their mistakes and in a highly unusual case and course of events. Plaintiff had been willing to help the defendants – but they ignored Avery, which led to this lawsuit. Some of the defendant's mistakes are enclosed in this document – to help everyone understand as to why this suit was filed.

In this document, and before continuing on, the use of the words "Plaintiff", "Avery" or "I" are words that will refer to the same individual – William Avery. Furthermore, it has been stated and cited in document filed with the Court by defendants, that Avery's prior lawsuit filed in the Court of Federal claims was not properly double

spaced. As this issue was not pointed out in that Court, the Plaintiff will now double space this and all future documents filed with this Court.

## I. DISPOSITIVE MOTIONS

Defendants per their April 17, 2006 document entitled "PARTIES REPORT TO THE COURT AND DISCOVERY PLAN", at bottom of page 1, have indicated that they are going to try and dismiss again by summary judgment, as having immunity for the words "claims sounding in defamation" – as the United States has immunity for and against defamation claims. Next, defendants have already indicated to the plaintiff, that they are also going to try and dismiss by summary judgment citing that The Gramm-Bliley Act does not provide for any available cause of action.   To save everyone a lot of time and only requiring one sentence, Dr. Avery already relinquished the Gramm-Bliley Act and did so in his amended argument to the Court of Federal Claims in 2004. So there is no need to waste this court's time on that argument.   Dr. Avery did and will be proceeding under the Fair Credit Reporting Act (FCRA) and other causes of actions.

## II. INFERENCE of "claims sounding in defamation"

To further save Defendants and argument as well as the court additional time, so that you may understand the wording and adjust your thoughts, when Dr. Avery says "credit defamation" - it is convenient only as a catch- all for what did occur and can be proven in evidence as (1) overcharging on a student loan (2) inflating the debt of student loan (3) not having accurate records of student loans (4) ignoring the customer when trying to correct the incorrect balance (5) credit defamation and reporting the incorrect

debt to credit bureaus and for several years (6) obstruction of justice by blocking and obtaining a summary judgment to block / stop disclosure of vital information by the injured party (7) harassing to collect an inflated and wrong sum of money (8)placing insurance sanctions(attachment 16) and garnishment on a professional individual having an unblemished professional record (9) attempt to stop the income of and to block dental patients needing dental services provided by a dentist office located in an underrepresented and underserved community where there is high need and few dentist willing to treat this population (10) intentional infliction of emotional and financial distress (11) injuries not properly yet described or uncovered by attorney (12)prosecuting an individual and rush to obtain judgment without accurate, nor adequate records and after having the opportunity to obtain said correct records from Avery (13) abuse of summary judgment (14) intentional and undeserved professional and financial/credit sanctions. (15) Intentional malice (16) fraud.

Rather than write these extensive 16 points - a thousand times and bore the court with having to constantly re-read them, plaintiff Dr. William Avery found two much smaller words that would at least infer these 16 previously mentioned points. These points are actionable under United States Law. Should the defendant still want to proceed with an elaborate claim of immunity and citing government immunity for using the word "defamation", plaintiff can and with the Courts request, rewrite these 16 points several, several times.

Furthermore, and If defendants do not like the words "credit defamation", Plaintiff can

and with the courts permission, easily amend these two words and choose new words

such as "administrative recklessness by the United States", or administrative/government

recklessness, unnecessary harassment and gross incompetence by the United States" –

which the single point of credit defamation is just one example. Any new statement

will still include the same previously mentioned 16 points.


By any wording, the sixteen points are still the same and will be evidenced in this

document as being committed by the defendant. Avery does not put the entire weight of

this lawsuit on the words "credit defamation" – as it is simply a catch-all phrase and for

all sixteen points that plaintiff can change to new wording if such would please the Court.


Another case of credit defamation, settlement award and having inclusive charges is

located on page 38 - 42 and as attachment 11.


### III. OVERZEALOUS AND INACCURATE RUSH TO JUDGMENT.

Plaintiff strongly feels that the government did not know what they were doing

and are about to learn such. Simply stated, defendants did not and have never known

what is going on here. Defendants would have learned this in 1992 – if they hadn't

opted to give me a voluntary dismissal in 1994 (attachment 4) and instead of a trial. The

government would have learned it again in 1998 if they hadn't blocked Avery by rushing

for and obtaining summary judgment (attachment 1). Plaintiff have always felt that the

government didn't know the "goings on" and what had happened here nor that the

defendants were aware of their actions affecting the inaccurate accounting and reporting of these student loans and making matters worse.

## IV. THE POWER TO DESTROY SOMEONE'S LIFE COMES WITH RESPONSIBILITY (CONCEPT OF CAPITAL PUNISHMENT)

If you are going to empower yourself to obtain a judgment having incorrect balances, sanctioning Avery and then report him to all credit bureaus- listing a debt – then Avery should at least have the right for accuracy. A simple example: If American Express credit card sends you a bill for $25,000 and you only owe $5,000 - you will be upset and balk at it. If you telephone American Express – you can request an investigation into the accuracy, at which time the company will examine its receipts. However, if you contact the United States, Justice Dept, Assistant Attorney for the United States – they don't believe you as they did not believe Avery, and the government took off running for summary judgment instead, and in the wrong direction.

If you do not know what happened here and is still occurring – because of the United States not knowing the correct balance nor bothering to find out, THEN HOW DO YOU RUSH FOR SUMMARY JUDGMENT and in advance of reviewing the evidence? Judge Kessler said at the conference hearing of April 18 that this conflict has taken to long. Plaintiff certainly agrees – and this document is to expedite, inform and hopefully get this outstanding issue resolved and without requiring additional years.

It has been difficult for plaintiff to find an attorney, willing to engage the United States as pro bono. Unchartered territory. No attorney has offered to take this case pro –

bono. Plaintiff cannot take out a second mortgage because the government, along with the incorrect judgment of 1998 has also placed a **lien on plaintiff's home, and also without notifying plaintiff of this action either**. It does not hurt plaintiff to be honest and state this fact, as such intentional actions are now a part of plaintiff's damages.

## V. HISTORICAL TIMELINE

Defendants as written in their interpretation, do not have a timeline of events that occurred here nor do the defendants seem to know the history of this case and certainly not what was done to William Avery and now by the government. The Justice department, the office of Assistant U.S. Attorney Fred Haynes, **has NEVER KNOWN the correct** balance as to Avery's student loans – and plaintiff will be able to show that the judgment of 1989 was a "made-up" and incorrect balance as defendants just wanted to win at all cost and by obtaining a summary judgment. Any judgment and against the plaintiff would suffice.


This explanation is being presented as defendant appeared at the status conference on April 18, 2006 as having no clue as to all that happened here and they themselves performed. Defendant's have not really grasped what is going on here, what they did that led to them being here – but are already indicating the filing of yet another motion for summary judgment and yet do not fully understand the case. Their statement of issues and history is flawed as they have never seen all of the facts, because they blocked their presentation with legal maneuvers and a previous voluntary dismissal in 1994, then summary judgment in 1998 and then lost the exhibits in 2000. So how can they now

prepare a summary judgment for evidence/ explanation that has not yet been presented??? This is why we at least take depositions.


It is very important to this case that the Court know the history of this suit. To begin, there are mistakes and omissions in the history as provided to this Court as by the defendants.

## VI. BEGIN

As stated, this suit was filed in The Court of Federal Claims in October 2004. It was wrongly filed there but it was Assistant U.S. Attorney Fred Haynes who informed Dr. Avery that the Court of Federal Claims was the only placed where the Assistant U.S. Attorney would entertain or accept such a suit regarding incorrect reporting of Dr. Avery's student loan balances, overcharging, over listing loan balances and harassing to collect largely inaccurate balances that Avery did not owe and certainly did not owe to the United States, nor the Department of Education (attachment 15, inaccurate credit reports) . Then the United States and Dept. of Education placed insurance sanctions and blocking patients from coming to his office in need of dental services, to stop Avery's needed income - as it attempted to force Avery to pay sums of moneys that were incorrect and sums that Avery did not owe to the Dept. of Education nor the United States (see attachment 16 insurance sanctions, as there are several).


In the document prepared by defendant, entitled "PARTIES REPORT TO THE COURT AND DISCOVERY PLAN" dated April 17, 2006, it is written by defendants on page 1: "concluding that plaintiff's only possible viable claim was a tort claim against

the United States, as to which the Court of Federal Claims has no jurisdiction, that Court transferred the case to this Court."

In 2004, and after the Government performing garnishment, Dr. Avery questioned Mr. Haynes decision as to the relevance of sending him to the Court of Federal Claims, but had to do as he was directed by said attorney and representing the United States. Dr. Avery is not an attorney and was willing to do as he was instructed by the attorney Fred Haynes. To that end, what Dr. Avery did next was to indicate to the Court and on page one of his suit, that said Assistant U.S. Attorney directed that Avery must file this suit in that court. The result and referral to the District Court clearly prove that decision to have been incorrect and also cost and additional 2 years before it arrived and began to be heard properly in this Court.

Plaintiff ask the Court to consider this when it examines the defendants attempt at dismissal by citing a statute of limitations claim. If you review page 1 of the suit filed in October 2004 in the Court of Federal Claims, it list Mr. Haynes title and office telephone number to include responsibility for filing in that Court.

Furthermore, documentation will show that Assistant U.S. Attorney Fred Haynes actually was advised of Dr. Avery's litigation, even though he stated in March 2006 and to Dr. Avery that he didn't know about this suit (attachment 10, & 9). It was he who gave Dr. Avery the address and information as to the Court of Federal Claims. Now see attachment 9, as this is a document regards a stated agreement to write a letter of

subordination – so Avery could refinance his home to a lowered interest rate and saving thousands of dollars that he could have applied to this judgment of 1998. The letter of subordination – never arrived nor was sent to Avery.    Do not be pleased as for some unknown reason, the expected document was never sent and the subordination did not occur nor did the refinance. Along with the over listed student loan balance, Avery was now paying more for his mortgage as well.

This document , attachment 9,  illustrates the mindset and of the Assistant U.S. attorney's office in regards to this matter before the Court to include, its undeserved attitudes, and treatment of Dr. Avery.

### VII.    LOST EVIDENCE, MISFILING AND ADMINISTRATIVE MISTAKES  AND  DELAYS HAVE  ADDED MORE YEARS THAN NECESSARY

Defendants indicated by document that they will attempt to file dispositive motions by May 22, 2006 as well as attempts at citing the statute of limitations as being against Dr. Avery.

The United States lost the evidence in his tort filing and only contacted Dr. Avery 2 years after losing said evidence filed in the year 2000.  They never wrote to ask him for the lost evidence but finally in deciding to return one of Dr. Avery's numerous telephone calls – they then informed him of their lost documents and could he mail them his originals (see attachment 7 dated October 2, 2002, from attorney Constance Foster). Dr. Avery in an effort to show good faith on his part, began making monthly payment on the 1998 judgment that US had obtained, even though he knew it was for the wrong

amount – but the United States would not listen. Dr. Avery agreed to make these payments and believing that his tort claim was being reviewed. Dr. Avery would later discover that while making his good faith payments, the United States was in fact doing nothing for two years and had lost the exhibits – of which they did not contact Dr. Avery. See attachment 7, dated October 2, 2002, from attorney Constance Foster, acknowledging receipt of the newly replaced evidence. It is only a document acknowledging receipt of copies of the lost exhibits. They never wrote to Dr. Avery to request them. Dr. Avery now stopped making his good faith payments and since the United States was not doing any sort of review and for two years as they had led him to believe that they were , when in fact they were not (see attachment  8). There is no document requesting the evidence because same office **never sent** a document to Dr. Avery and only did so in 2003 – denying his tort claim.

In 2004 attorney Fred Haynes garnished Dr. Avery's checking accounts and extracted approximately $5,000 despite being told by Dr. Avery and with documentation that Dr. Avery had filed a tort claim against the United States.  This is when attorney Fred Haynes informed Dr. Avery that he must file his suit with The Court of Federal Claims and Avery did so in October 2004.

Dr. Avery has since 1988 informed anyone involved with these student loans – that the government was  not reporting the correct balances to credit bureaus and Dr. Avery was denied loans, access, to finances and finally terminated by some dental insurance companies – for his dispute of incorrect credit reporting, overcharging him and sanctions being created and done by the Dept of Education.( see attachment  5, the

response and correction by the credit bureau dated 11/15/88). These mistakes certainly created emotional and financial distress. The evidence of overcharging Dr. Avery will be examined in attachment 15 and 16 which includes credit reports and insurance sanctions respectively and created by the government and its actions.

Even with the reading of this document, Avery can prove that over $10,000 of student loan balances – has disappeared and again not being reported correctly by the Dept. of Education. In attachment 3, Avery will prove beyond a doubt that 2 years of student loans and their required documentation are in fact missing.

Evidenced by exhibits and by the entry of this document, Avery will also prove that a recorded payment of $20,000 and reported on his credit report – was actually NEVER made attachment 15, page xxx. The Department of Education and the Justice Department – have never known what they were doing here and were out of control in regards to Avery.

The Court may ask " this is incredible and how did this happen ?" The Court will learn through documents – about the treachery to recruit Avery, who was a senior at the University of Minnesota in 1981 – to lie to and deceive him into moving his family to dental school at the University of Pittsburgh in 1982.

## IV. NECESSARY DIGRESSION, HISTORICAL INFORMATION. IT IS NOW NECESSARY TO REDIRECT. TEMPORARILY FOR SOME PAGES

In 2006, hopefully this country is in a different mindset regarding race relations and health care (I doubt it). However in 1978 the Bakke Decision limited or ended racial preferences in medical schools and the few seats that minorities occupied. William Avery was a resident of Minnesota and a student at the University of Minnesota and did not have to deal with racist attitudes or had not PERSONALLY ENCOUNTERED ANY in his pre-dental curriculum. However and when arriving at Pittsburgh Dental school is where Avery first encountered and ran into the resentment and deception when he arrived at Pittsburgh in August 1982. White dentist who historically did not practicing in black American communities of which there was and still is a noticeable disparity between health care and between the two communities ( see attachment 12).

While attending the University of Minnesota, Dr. Avery had to meet all of the pre- dental requirements that the white students had met. He was however in their Martin Luther King Program at the university, which was designed to lessen the drop out rate of disadvantage students – which was also unusually high at that university. The Martin Luther King Program (MLK Program) began in 1977. Avery entered their program in 1978. Avery was their first student to ever make it to graduate school. In the entire city of Minneapolis, there were 5 -6 minority dentist in 1982. The dental school wanted minority students to apply - but many did not want to or were not interested in this profession and for various reasons.

Since the third grade plaintiff had always wanted to be a doctor. Plaintiff did not know about dentistry as a career because plaintiff wasn't taken to a dentist for

regular check-ups. The only doctor plaintiff ever thought of becoming was a medical

doctor. Plaintiff's first dental treatment was received was when he went to dental school

in 1982 at the age of 23. Plaintiff had never had any dental care. When baby teeth

became loose, they were taken out by hand. Plaintiff's mother was thrown out of white

dentist office when she was a little girl and so she did not want to go to them and when

older, she did not take her family to the dentist regularly. Plaintiff's father, being from

Arkansas, the white dentist only extracted their teeth – when they could have restored

them. Plaintiff's father's introduction to restorative dentistry was when he entered the

military.

William Avery was offered a full scholarship and living stipend from the

University of Pittsburgh if he would attend their freshman class and starting in September

1982. That is the only way that they convinced William Avery to leave Minnesota, as he

was doing well there. Obviously if he had a full scholarship and stipend – then how did

he end up with these student loans from dental school? Unknown to Avery was that he

was walking into a mine field of animosity at Pitt Dental School.

Clearly and in evidence , it will be shown that Pittsburgh Dental School, the state

of Pennsylvania Higher Education Assistance Agency (called PHEAA) and the

Department of Education did not share accurate, adequate or correct records with each

other. There were faculty/instructors at the University of Pittsburgh, who were in a

position of authority, which held animosity to minority students receiving the grant that

Avery received when he was accepted at the dental school. A ghost of , "were they

qualified to be here"  as if it were a privilege to be going to this graduate school with them.  Avery wasn't impressed by being there then and certainly not now.

In 1982,  Avery discovered that a bunch of "nobody's" at the dental school in Pittsburgh had become overnight authorities on the Bakke  Reverse Discrimination decision of 1978,  and how they would conduct the  treatment and admission of minority students at "THEIR" dental school as well as the handling of an **unnamed** "Minority Grant" that **would never be placed in writing** and deliberately by the dental school-- even though Avery was receiving it  and had been offered it if he would attend the school. (Attachment 3, page 1-5 clearly proves that  the grant  existed.)

For the first time in his life, William Avery would be called a "problem student" by a white instructor  and doctor and to William Avery's face. That instructor is now dead and of a horrible death.

"The Grant" was never documented **and deliberately being done this way**. However Dr. Avery obtained the name of the Grant and sums previously paid to his account by the University of Pittsburgh and provided it to the United States.   This document was ignored as well by the United States and is  enclosed as attachment 3  and also attachment 9.

Defendants will soon realize that ignoring this document was yet another mistake of theirs.

### VII. THE MYSTERIOUS GRANT HAVING  NEITHER NAME NOR  DOCUMENTATION

The state of Pennsylvania had trustingly but foolishly placed this grant in the control of individuals at Pittsburgh **who despised the grant.** The people at the top understood its purpose, however the middle man (and women) despised it. The mind games and financial adversity that Avery encountered even at the financial aid office would only add more misery to his attendance at the dental school.

There were those Avery discovered, that wanted to see more loan debt placed on his attendance there. Put it simply –they wanted to see him with/having more debt. Avery immediately tried to transfer once he realized the deception and that he had been lied to by the school in order to recruit minority students who would not consider or bypassed Pittsburgh Dental School completely. It was an embarrassment to the school and the state – that there were so few minority dentist.
Even a black Pittsburgh attorney asked Dr. Avery, "why would you want to come here?" Avery didn't know what he was walking into as he had been deceived.

The out-of- state tuition for a graduate student is twice that of a resident – and illustrates Pennsylvania's inability to recruit their in -state and minority population. Based on what I experienced there, I also would not want to attend Pittsburgh, and I have never returned.

Pittsburgh often could not recruit its minority residents – who often chose to go to dental school out-of-state. Avery didn't know the animosity that he was walking into or he was have bypassed the school also. The Bakke Decision had been a medical school

decision that was carried over by some and into other schools. There were those quick to infer their power and interpretation for Avery and involving "the Grant", as if he did not deserve it.  To that end and animosity, "The Grant" would exist but have no documentation. The only people who knew about it were the ones who were told about it.

It is interesting to note that the individuals who resented this grant- that they themselves had no intention of practicing in a minority area – where the income was lower and the people were different from them.  These residents of America also have teeth, and dental problems  – just like the wealthier communities.

But  some instructors at Pittsburg, in positions of authority, empowered themselves to be authorities of the Bakke Decision and over the few minority that were attending "THEIR" dental school as if they privately owned the school that was funded by  public, government and state programs.

Avery, knowing that he was going to have  less income  that white dentist, looked for schools that had grants and  scholarships .  A white student would have been called frugal, wise and smart.  Avery knowing he would make less than the average income for white dentist, and to that end he did not want loans and was accepted at every school he applied. Pitt made the best financial offer – but it was a trick. Once Avery arrived and had declined other graduate schools that had accepted Avery, loans would then be shoved in his face and by the Pittsburgh financial aid office.

Avery had not even applied for financial aid in 1982 and from the dental school as he was unaware that he would be taking any loans. As evidence and proof, the microfiche copy of Avery's financial aid (attachment 3, page 1), bears the **date of 9/24/82** – and is well after everyone in his class had received financial aid for the semester that began the first week in September. Clear proof that Avery had been tricked.

Avery had actually missed the deadline for financial aid and applying for these loans. Most of us who have attended college already know that if you miss the deadline – you don't get financial aid and for the upcoming year.

## VIII: PAY ATTENTION: DEFENDANTS WERE BLOCKING DISCOVERY OF THE CORRECT BALANCE

Defendants need to pay attention here : However, a telephone call was made by someone at the dental school – to someone in Harrisburg  - and Avery's financial aid application  was process in August 1982. NOW TURN TO attachment 3  and look at the microfiche that Avery  already gave to the defendants – **but they ignored it**. The microfiche gives the date and proof as to when it occurred. Turn to page 1 and look at the date of 9-24-82.  It wasn't suppose to be allowed to occur – but it did and eight months late. The powers that be – made it happen and outside of the rules.  Are you starting to realize the importance of this document /microfiche ??  You ignored it, and by filing summary Judgments, **I couldn't present it** – and therefore you would never know the correct balance. In stopping me, you have been blocking yourselves from obtaining the correct balance.  You have always treated me as the lying and guilty party. **I am neither**.

19

At the interview, the associate dean, Dr. Draus told Avery about the Grant - but did not tell Avery that it was being kept a secret. The grant was handed over to another associate dean named Ann McFadden in 1983 who along with the financial aid office on campus – coordinated the grant. The grant would not and was never put in writing despite student Avery being told to the contrary by Ms. McFadden. and Avery's school counselor Dr. Charles Eigenbrode. I will expound on that later.

In 1992 and five years after his graduation, when Dr. Avery was prepared to go to trial, these witnesses were still alive.

Dr Avery wanted this trial and hoped McFadden and the University of Pittsburgh were going to meet him in a courtroom and on equal ground – without the threat of graduating, to be hanging over his head. If Avery could get a trial, it was going to be payback for five years of nonsense, heavy financial debt, separation from his family - and **with a vengeance**. You can only read these words and will never feel the humiliation/ anger that Avery experienced.

Avery had his degree and was coming back to straighten this mess out, correct the finances and put these lying and deceiving individuals in their proper place to end the hiding of that "mysterious grant" and other nonsense at the school– that would not be documented. The "grant" no longer exists. See attachment 13, dated January 8, 1998 to Dr. Whitehead, University of Pittsburgh dental school.

## IX. HOWEVER

The state of Pennsylvania dismissed the case and under voluntary dismissal (attachment 4). Avery recovered nothing and received nothing in the way of damages and never received a hearing, trial or apology. He got nothing but his loans and this debt released from Pennsylvania. Four years later, Avery would discover that it wasn't permanent. The likelihood that the government " most likely wouldn't bring the case back" turned out to be an incorrect statement made by Avery's attorney in 1994.

Ann McFadden is now deceased.

Avery discovered that in Pittsburgh he was treated by some at the school as not deserving a grant and only received such because he was black. You would think that he had not completed the pre dental requirements and just walked in off of the street. Avery did not develop close friendships with them. Avery's mission became to graduate and get out of there immediately.

Avery being deceived and tricked, Avery completed his graduate curriculum, where he loved treating his patients – and immediately left the school in 1987 and immediately upon completion. After being made to do an extra year – because of the lie and financial hardship. Avery had learned to "wear a smile" to get through it- but he was not finished with the University of Pittsburgh. Avery wanted that trial (see attachment).

Avery had completed the same requirements that the white students had completed but unlike the white students – they had no intention of practicing in a minority area or accepting welfare / public assistance insurance from the government for minority or poor patients. That is one noted reason why the grant existed- as these students had no

intentions of servicing these equally deserving communities but having poor, minority, higher crime and poverty. More expensive, elective and higher profit making dental services could not routinely afforded by these people- thus these communities were not considered for new dental offices. Avery knew this, and actively sought out schools with grants and financial aid – to keep his loan debt under control.

What I discovered was that one of the controllers/administrators of the Grant – didn't like that I HAD SUCH LOW LOAN DEBT from college in Minnesota. It was really none of her business, but when McFadden asked me what my indebtedness was I proudly told her that it was very little. I did not know why she wanted to know this.

Now at her school in Pennsylvania – she had the power to put loan debt on Avery and at an amount that she felt would please her and as if she now scoffed at the years of work and financial preparation done by I and my parents. That is another reason I discovered the grant was not placed in writing - so she and any individual handling this mysterious Grant, could decide what she/ they wanted you to have and what else would be more and in loans. McFadden played with the money and had the power to give or take what she wanted you to have. She did not know or care what sacrifices that my parents had made to help me obtain a good education without placing me in to much debt that I could not manage. With nothing in writing, you had better not question McFadden's acts. She was God. She did not want us talking to each other and discussing what we received from her.    We talked.


An exercise in manipulative power and mind games. Make this woman angry and scoff at her practices  - and you would have an even more difficult time graduating. Her

name was Ann McFadden and I will never refer to her as Dr. Ann McFadden. That is one right that I do have every school would call and talk or communicate with her as to why I wanted to leave. She never told the truth as to why I wanted to leave.

Ann McFadden then never allowed Avery to interview any minority student for the remainder of the 4 years that I was there. I asked her about this and she said I, "was always unavailable." Her statement wasn't true – and she was just getting around me. I would not lie for her or about that mysterious grant..- to trick other students into coming there and going through what I needlessly endured. Five years is a long time.

At my initial interview with the school in 1982 , the associate dean Dr. Draus did not tell me that they were keeping this scholarship Grant – a secret.. If I had heard this I would have known that something was wrong at this school and would not have attended this school.

Avery learned / discovered that white students were receiving grants and scholarships – but Avery's was being kept a secret, as if he didn't deserve it, was illegal or would anger white students.

## RETURNING TO PRESENT CASE

When my countersuit was filed in 1992 and against PHEAA ( Pennsylvania Higher Education Assistance Agency) – these people were alive and could appear in court. PHEAA and Pennsylvania attorneys opted for a voluntary dismissal in 1994

(attachment 4). I didn't like it, this school and its practices had caused much damage in my life, and my attorney advised me to take the voluntary dismissal and get on with my life. I tried to regain my life, the lost years, apologizing many times to my family, and to my daughter for the unforeseen separation of years.

## X. HERE COMES THE UNITED STATES

In control and knowing nothing in 1998, the United States Justice Department decided to recreate my problems. No one called or contacted me , to ask me about the voluntary dismissal in 1994. The United States just began suing me again. The conflict with the Justice Department, Dept. of Education, and Attorney Generals Office began anew. Now, after almost 4 years, a new and incorrect debt was put back on my credit report – as deliberate – and left there. See credit reports as attachment 15.

What may further embarrass the United States, is that in the attainment of Judgment in 1998 – The United States was inadvertently working for me. I needed the United States to obtain that Judgment - so when I obtained copies of said judgment, I could force the credit bureaus, to immediately remove the higher and incorrect amounts that the government was reporting incorrectly to creditors despite my constant denials and request for the correct balance. IT IS IRONIC THAT REQUEST FOR VERIFICATION of my incorrect student loan debt, would come back either as "account deleted...verified or reporting accurately" – the incorrect balance. Copies of credit reports and listing their dates, are enclosed. The Dept. of Education and the U.S. Attorneys Office did not care. As you read this document, I can prove – with a

document from the University of Pittsburgh microfiche- that there judgment was

incorrect by at least another $10,000.   The United Stated has been uncaring , hard headed

and very nasty towards me.   That will end with this lawsuit.   I clearly wrote in my

document to the Court and entitled "PARTIES REPORT TO THE COURT AND

DISCOVERY PLAN", prepared by defendant and I that I was amenable to settlement

and the defendants clearly told this court "no".

### XI.   IT NEEDS TO BE FINALLY OVER

Now say, "gee whiz- they were dumb… they don't know they were doing…

judgment helped you… be happy that they screwed up again."

My response would be, "no, just like the voluntary dismissal that I received in

1994 – I trusted the lawyers for state of Pennsylvania when they gave me a voluntary

dismissal. The United States can stab me in the back again and did so in 1998. They can

come back again and again."     After 19 years it has already been a never ending

nightmare.  This lawsuit is to (1) get the truth, deceptions and mistakes out in the open

(2) seal the casket closed as I never want  to have to bring this case back again and as a

never ending nightmare.

### XII.   NUMEROUS MISTAKES and YEARS OF MISMANAGEMENT by DEFENDANTS  – IS AN INVALID ATTEMPT TO NOW CITE STATUTE OF LIMITATIONS.

So if there is an attempt to cite a statute of limitations – it is an invalid argument

by the United States and this document containing said evidence – will prove otherwise. I

have always provided and been willing to to give this information to anyone that

requested it and for years. In regards to and by the United States, I was always ignored, passed along to different departments, and or given wrong information and as of late incorrect information from the U.S. Attorneys office.

## XIII. LAWSUIT COULD HAVE BEEN AVOIDED IF ATTENTION HAD BEEN GIVEN TO PLAINTIFFS EXHIBITS

As this Court is aware, it was the U.S. Attorneys office that filed for a three week extension. The attorney called me in March 2006 and said he was unaware of this suit. In 2004 said and same U.S. attorney performed and placed a garnishment on my bank accounts – and I have clear evidence and documentation that he was told about thus suit and at the Court of Federal Claims – where he sent me. The Assistant U.S. Attorney did what he wanted to do. However in March 2006 in a desperate call to my office for an extension, he told me that he was unaware of this suit and were now "overwhelmed" by the bulk of documents that he "just received". The documentation in attachment 10 – will show otherwise. I knew by the courts rules that I have to grant an extension so I should at least be pleasant about it. Attorney Haynes, was really asking for more time to find a way to dismiss my case. His tactics haven't changed. For some reason he didn't call me when he garnished my bank account. Didn't care then – but he was calling me now.

NOT THIS TIME: **NO STATUTE OF LIMITATIONS CLAIM**

This case could have been in this courtroom **two years earlier** if I had not been given wrong filing information by the defense attorney. It could have been **four years earlier** if the U.S. had not lost exhibits and evidence in my tort claim of which they never

contacted me for copies. The examiner, atty. Constance Foster for the United States, finally decided to return one of my numerous telephone calls to her office requesting an update.

The examiner for the tort claim, Ms. Foster apologized to me and told me that she would stick with me and **ON THIS CASE** until her office rendered a decision. After Fred Haynes performed the garnishment in 2004, I contacted attorney Constance Foster immediately and she left a message on my answering machine and now saying that she was transferring my file to someone else. I saved the recorded message on my answering machine. I have been told anything that any official wanted to tell me- even when they were lying to me, to save their face. I was being passed around and between government offices yet again.

The government has been hard -headed, distrustful of me and in some cases just plain stupid. Here was a man who knew the correct balance and could prove it. Yet they trusted their own records, ignored Dr. Avery - and their records were flawed. Avery was telling the truth and all along. In the exhibit and evidence obtained from the University of Pittsburgh Dental School, - not only is the grant listed and for 5 years – but also the STUDENT **LOANS THAT I RECEIVED, ARE LISTED THERE AS WELL**. IF THE GOVERNMENT IS YET SMART ENOUGH TO MATCH ITS LOANS WITH THE MICROFICHE RECORD OF ME – THEY WILL FINALLY REALIZE THAT SOME OF THE LOANS ARE MISSING AND YOU have ALWAYS had an incorrect balance. I have been saying that things were not correct and for now 19 years and have always been overlooked, and not trusted.

## XIV.  INTRODUCTION AND EXPLANATION OF THE ATTACHED EXHIBITS

Do I have your attention now?   It took a lawsuit before you stopped ignoring me. Please now supply the paperwork for ALL of those loans – which defendants and the United States is, suppose to have. I  assure you that you cannot do so. The state of Pennsylvania did not have them at the voluntary dismissal in 1994, so it will be interesting if they now appear in 2006.  Knowing how Pittsburgh was – they will never appear.

Your eyes will start to open if you turn to exhibit and look at the notations I have made regarding the loan record. Two years have disappeared. I told you that there was animosity about a Grant  that I received. I cannot prove the animosity without documentation as I did not have a camera – but I can certainly prove that someone screwed up my financial aid records – and in just this one document.  I have been trying to tell you people for 19 years, but the United States performed a summary judgment and blocked me from court trial or disclosure. I never got to speak to anyone. That was your loss.

Look at exhibit 1, provided by the United States when they obtained summary judgment on February 17, 1999 for a **total of $67,088.**   I attended dental school at the University of Pittsburgh from September 1982 to June 1987. The Assistant U.S. Attorney should realize that this is five years.  I was forced to take out student loans each of the five years that I was there

## XV.  MY LONG AWAITED EXONERATION

Turn to attachment  2.  Hint 1: look for loans and in the academic year 1983

Hint 2:   look for the year 1985

Are your eyes starting to open?  How is this possible and what happened here ?

Look at the bottom of the page and see "unpaid principal balance of $29,104.76.

I could not prove to PHEAA that they were wrong and they would not correct their records as they trusted their documents and not me.  Also notice that this copy of the document does not have my signature on it.  I'll expound on this several times.

Turn to attachment 3, the official record kept at the Bursars office at the University of Pittsburgh.  It is the ONLY and OBVIOUS  proof that the minority grant and having no name  **did in fact exist**  of which the school was placing $50,000 plus in out-of-state tuition – but would not document the scholarship.

## Now find the missing and unlisted loans:

1) 9-23-83 $4,664.58 ( max you could get with PHEAA was $5,000 that year)

2) Turn to page 3 and see date 8-30-84: Guaranteed student loan $4, 662.50

**Here are your missing loans that no one believed me about**.  You are going to learn even more - if you had paid attention several years ago.  Without the microfiche from Pittsburgh, I could not prove these loans or what was done to me.  Keeping my status undocumented, no one would find out what was done here and I couldn't expose the school or the truth.

I would pay dearly for "the scholarship from hell". In 1982 credit reporting wasn't the sophistication that it has become now. Once it is placed on your credit report, if the person doesn't have documentation, you are not believed.

I had no documentation. Remember that exit interview that I didn't get?? That is why I am curious about the repayment obligation that is unsigned by me (attachment 2). I will expound on that later.

At the exit interview Pittsburgh Dental School would have had to disclose the name of that grant, provide paperwork, and balances of student loans. For that, I didn't get an exit interview and had no documents to take straight to an attorney. I was on my own.

Now turn back to attachment 2, "Repayment Obligation from PHEAA"... I previously stated that I was not given an exit interview, but my classmates did receive one. You are about to see another deception that you missed.

1). There is no date on that repayment obligation

2) Notice that my address on the form is now Washington D.C. –so obviously I never had that exit interview in Pittsburgh.

3) Why does this document and supplied by the United States, not have my signature?


### A MONETARY DECEPTION GOES UNNOTICED


On the same document, now see the date of: